**UNITED STATES of America, Plaintiff,**

v.

**Manuel Antonio NORIEGA, Defendant.**

**No. 88–0079–CR.**

United States District Court,
S.D. Florida.

May 3, 1991.

Norman A. Moscowitz, Sonia Escobio O'Donnell, Marcella S. Cohen, Asst. U.S. Attys., for plaintiff.

Frank A. Rubino, Coconut Grove, Fla., Jon May, Miami, Fla., for defendant.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

HOEVELER, District Judge.

This action arises out of the government's review of Defendant Manuel Noriega's telephone conversations recorded by officials of the prison where Noriega is presently detained pending trial on various narcotics-related offenses. Noriega, asserting violations of the Sixth Amendment, the Fourth Amendment, Title III of the Omnibus Crime Control and Safe Streets Act, and Rules 16 and 17 of the Federal Rules of Criminal Procedure, moves to dismiss the indictment. With respect to the claims asserted under the fourth and sixth amendments, the court finds that the defendant's constitutional rights were not violated. The Title III claim, based on improper disclosure of intercepted communications, is not actionable in the context of a motion to dismiss and therefore not properly before the court. The court finds that the prosecution's method of obtaining the recordings and its failure to disclose these conversations in the course of discovery violated Rules 17 and 16, respectively, but that no resulting prejudice has occurred. Accordingly, the motion is denied.

## I. BACKGROUND

Noriega has been detained at the Metropolitan Correctional Center ("MCC") in Miami since January 28, 1990. His trial is scheduled to commence on July 22, 1991. The present controversy concerns the government's review of Noriega's conversations, including attorney-client discussions, recorded at MCC and obtained by the government through subpoenas served on the prison's custodian of records.

For security reasons, MCC automatically records and randomly monitors all inmate calls made from the institution's telephones, with the exception of properly placed calls to an attorney. The recording system at MCC is set up so that all inmate telephones are linked to a central recording system which automatically records all

calls placed through these phones. . Since all recording is conducted through the central mechanism, the monitoring and recording capabilities on the inmate phones cannot be "shut-off" on an individual basis. Inmates who wish to make an unmonitored and unrecorded call must therefore use a staff telephone which is not linked to the central recording system.

Because Noriega is physically segregated from the other inmates and not permitted to use the inmate phone banks located in the main facility, a telephone was installed outside the door of his cell. Whenever Noriega used the telephone, he would give the guard the name and phone number of the person he wished to call. The guard, after dialing the number and confirming the identity of the voice on the other end, would then hand the receiver to Noriega through an opening in the door. Initially, Noriega's telephone did not have monitoring and recording capability because his phone was also used by prison guards. However, about two to four weeks after his arrival at MCC, this phone was replaced by a second telephone which was connected to MCC's central recording apparatus so that all calls placed on it were automatically taped. A sticker affixed to this second telephone advised Noriega that all calls made on that phone, with the exception of "properly placed" calls to an attorney, were subject to monitoring and recording by the Bureau of Prisons.

A telephone log maintained by MCC reveals that Noriega made over 1,400 telephone calls from February 1, 1990 through November 8, 1990, many of which were to Noriega's attorneys and other members of his defense team. As all of these calls were made through the telephone installed outside of Noriega's cell, the vast majority were recorded.

On February 8, 1990, the government served the first of eight subpoenas upon MCC for production of Noriega's tape-recorded conversations.[1] The tapes were sought for potential evidentiary and investigatory value in the underlying criminal prosecution. The subpoenas were actually subpoenas *duces tecum*, commanding the custodian of records at MCC to appear and testify in the courtroom of this division on various dates, beginning February 15, 1990 and running through August 18, 1990, and to bring telephone logs and tape recordings of Noriega's telephone calls, as well as telephone logs and tape recordings of any calls made by any inmate on behalf of Noriega. In fact, no hearings in this case were scheduled on the dates and times listed on the subpoenas. Moreover, although the subpoenas called for production at the courtroom, the tapes were picked up at MCC by a Drug Enforcement Agency ("DEA") case officer. Neither the defendant nor this court were aware that these subpoenas had been issued.

Before the tapes were reviewed, the trial team took steps to shield itself and its case agents from any attorney-client conversations that might be contained on the tapes. Pursuant to procedures established by the prosecutors and memorialized in a memorandum dated March 6, 1990, the tapes were to be screened first by an "outside" Spanish-speaking DEA agent unconnected with the case to ensure that no attorney-client conversations were on the tapes. If a tape consisted of attorney-client communications, the outside agent was to immediately seal and segregate that tape from the others. If only portions of a tape contained attorney-client communications, then only a sanitized copy or transcript would be provided to case agents and prosecutors.

Beginning in April, 1990, the outside agent reviewed an initial batch of 21 tapes produced by MCC. The agent then made an edited set of these tapes to include only those conversations potentially relevant to the case. This edited set was then turned over to a DEA case agent assisting the prosecution. A second batch of 71 tapes was then obtained from MCC. None of these additional tapes were screened by the outside agent, although some and possibly all were screened by an official at MCC. Twenty-two tapes out of this second batch

---

1. The subpoenas also called for the production of tape-recorded calls of three of Noriega's code-fendants. However, only Noriega's conversations were produced.

were reviewed by Jose Blandon, a government witness in the case against Noriega. Additionally, 31 tapes (including the 22 reviewed by Blandon) were turned over to a DEA case agent, who listened to only some of these tapes. Finally, a last batch of 70 tapes was obtained by the DEA. However, none of these tapes were reviewed, as the prior batches had yielded nothing of apparent value to the prosecution. Thus, out of 162 tapes subpoenaed, only 52 tapes were actually examined.[2]

The Blandon review occurred under the direction and supervision of several DEA case agents who were subsequently briefed by Blandon on the results of his review. One of the conversations Blandon heard involved an attorney-client discussion of two potential government witnesses, whom Noriega had learned of from an article in *The Miami Herald* newspaper. Blandon conveyed the substance of this conversation to at least one of the DEA agents, Steven Grilli, and also described this conversation in a memo he prepared for the prosecution's use. Grilli did not discuss the attorney-client conversation or the results of the Blandon briefing with the prosecutors, apparently because he viewed the information obtained as essentially worthless.

At some point, Grilli sent a copy of the Blandon memo to Pat Sullivan, the lead prosecutor. Sullivan proceeded to read the memo but stopped when he came upon the first few sentences of the attorney-client conversation described by Blandon. Sullivan then got in touch with the outside agent and instructed him to conduct a further check to determine whether the particular tape containing this discussion consisted of any attorney-client conversations. The agent erroneously reported back that there were no attorney-client conversations on the tape. Nonetheless, Sullivan stated that he never resumed reading the memo.

In addition to the attorney-client discussion memorialized in the Blandon memo, a few other attorney-client conversations are

contained in the tapes subpoenaed from MCC and reviewed by the DEA agents, as revealed by summaries of these tapes submitted by the government in connection with the motion at hand. Thus, despite the screening procedures put in place, some of Noriega's attorney-client conversations slipped into the hands of the DEA case agents assisting the prosecution.

The government's examination of Noriega's telephone conversations was brought to light when copies of some of the tapes subpoenaed by the government were obtained by the Cable News Network ("CNN") from an undetermined source. Network representatives, intending to air a story on the government's actions in this regard, approached Noriega's lead attorney, Frank Rubino, and played portions of the tapes in its possession. Among the conversations played for Rubino was the attorney-client discussion reviewed by Blandon. Noriega subsequently moved to dismiss the indictment, contending principally that the government's invasion of the defense camp violated his Sixth Amendment right to counsel. Blandon's exposure to Noriega's conversations, and the effect that exposure might have on his appearance as a witness, is an issue not presently before the court.

## II. DISCUSSION

### A. The Sixth Amendment Right to Counsel

 In determining the Sixth Amendment claim, the threshold inquiry is whether Noriega had a reasonable expectation of privacy in his conversations with his defense team recorded at MCC. Under the established law of the Eleventh Circuit, the Sixth Amendment protects attorney-client communications from government intrusion only if they are (1) intended to remain confidential *and* (2) under the circumstances were *reasonably* expected and understood to be confidential. *United States v. Noriega*, 917 F.2d 1543, 1551 (11th Cir. 1990) (emphasis in original), *cert. denied,*

---

**2.** The number of tapes reviewed is not indicative of the number of conversations reviewed, since each tape contains several conversations.

— U.S. ——, 111 S.Ct. 451, 112 L.Ed.2d 432 (1990) (citing *United States v. Bell*, 776 F.2d 965, 971 (11th Cir.1985), *cert. denied*, 477 U.S. 904, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986) and *United States v. Melvin*, 650 F.2d 641, 645 (5th Cir.1981)).

It is undisputed that MCC's policy forbids monitoring and recording of "properly placed phone calls to an attorney", and that Noriega was advised of this policy. Within a day after his arrival at MCC, Noriega signed a consent form containing the following language:

Monitoring of Inmate Telephone Calls

The Bureau of Prisons reserves the authority to monitor (this includes recording) conversations on any telephone located within its institutions, said monitoring to be done to preserve the security and orderly management of the institution and to protect the public. An inmate's use of institutional telephones constitutes consent to this monitoring. *A properly placed phone call to an attorney is not monitored.*

(emphasis added).

Additionally, a sticker affixed to Noriega's telephone hooked up for recording advised Noriega as follows:

NOTICE

The Bureau of Prisons reserves the authority to monitor and record conversations on this telephone. Your use of institutional telephones constitutes consent to this monitoring. *A properly placed telephone call to an attorney is not monitored.*

(emphasis added).

Finally, the notice on the sticker affixed to Noriega's phone is also contained in an "Admission and Orientation Manual" provided to inmates upon entry to MCC.[3]

Neither the consent form, sticker, or orientation manual give meaning to the term "properly placed" call to an attorney. The

absence of definition presents an ambiguity. The relevant questions, then, are (1) what constitutes a "properly placed" phone call to an attorney, and (2) were the procedures for making a "properly placed" call to an attorney otherwise communicated to Noriega so as to put him on notice of when calls to an attorney would be subject to monitoring and recording.

With respect to the first question, the proper procedure for inmate calls to an attorney, as gleaned from the testimony and documentary evidence presented to the court, is as follows: Inmates who wish to make an unmonitored, unrecorded call to an attorney must notify the guard, who must then refer the request to a member of the inmate's "unit team."[4] Although the formal procedures require that the request be in writing, accompanied by an explanation of why written communications and attorney visits will not suffice, a simple oral request is usually sufficient. If the request is approved, the inmate is then taken to a staff telephone with no monitoring or recording capability. As was explained in testimony by Mel Collins, MCC's associate warden at the time of Noriega's arrival and orientation, the inmate must specifically inform the guard either that he wishes the call to be "unmonitored," or that he wishes to engage in a "privileged" attorney-client communication. In other words, a simple request to call an attorney is not enough to secure an unmonitored, unrecorded phone line; rather, the words "unmonitored" or "privileged" must be invoked. If they are not, the guard directs the inmate to a phone set up for monitoring and recording. This latter requirement that specific words be employed is not set forth in any consent form or other document of which the court is aware, and it is unclear when and in what manner it is communicated, if at all, to MCC's inmates. The requirement of unit team approval is

---

**3.** The notices provided in the sticker and orientation manual are in both English and Spanish. The consent form signed by Noriega is in Spanish.

**4.** The "unit team" consists of counselors, case managers, and a unit manager, who deal with inmate needs and problems. It does not include correctional officers responsible for institutional security.

described in an MCC document titled "Institutional Supplement."

As to whether Noriega was informed of these procedures, the only written notification provided Noriega of which the court is aware consists of the consent form, the sticker on his telephone, and the "Admission and Orientation Manual,"[5] none of which explains what is meant by a "properly placed" phone call to an attorney. While prison officials did supplement these documents with verbal instructions, these instructions appear to have been inconsistent and to have resulted in a misunderstanding between prison authorities and Noriega.

The day after Noriega's arrival at MCC, the procedures as described to this court were partially set forth in the course of an orientation session conducted by Noriega's counselor, Frederick Mance. According to Mance, he explained to Noriega, through an interpreter, that requests for unmonitored phone calls had to be referred to a member of the unit team, the composition of which Mance then described. Mance further told Noriega that he should ask to speak to Mance if he wanted to make an unmonitored call. However, according to Noriega's attorney Frank Rubino, the procedures subsequently explained to him, and which he thereupon conveyed to Noriega, differed substantially from those outlined by Mance. Rubino testified that he met with associate warden Collins shortly after Noriega was incarcerated, at which time Rubino inquired directly as to how calls to an attorney would be handled. According to Rubino, Collins indicated that Noriega simply had to notify the guard that he was calling his attorney in order to secure an unmonitored line. Rubino stated that Collins explained that Noriega would have to tell the guard whom he was calling and the phone number, that the guard would then place the call and verify the voice on the other end before handing the receiver to Noriega, and that this procedure would

present "no problem" in separating attorney-client calls from social calls. Rubino stated that he was unaware that unmonitored calls could be placed only through staff telephones, as opposed to inmate phones, and was under the impression that the monitoring and recording mechanism on Noriega's phone would be "turned off" whenever Noriega called one of his attorneys. In view of the notice subsequently affixed to Noriega's telephone, which implies that properly placed calls to an attorney made from that particular telephone are not monitored or recorded, and absent information which would indicate the contrary, Rubino's conclusion, at least, would be reasonable.

Rubino's testimony does not appear to be contradicted by Collins. With respect to the procedures for making a properly placed attorney call, Collins recalls saying only that "attorney-client placed calls would have to be referred to staff." This statement is not inconsistent with Rubino's belief that Noriega simply had to tell the guard that he was calling an attorney in order to secure an unmonitored line. In no sense does it convey that Noriega's calls to his attorneys would be recorded unless he invoked the words "privilege" or "unmonitored" and contacted a specific subset of the staff, i.e., a "unit team" member. It is also instructive that the guards proceeded to act in accordance with Rubino's understanding of the procedures for securing an unmonitored line. The guards not only placed Noriega's calls and verified the voices on the other end, but also distinguished attorney-client calls from other calls by writing "attorney" on the telephone log entries reflecting calls to members of Noriega's defense team. These actions lent credence to the procedure as apprehended by Rubino and seemingly precluded the need for any further clarification or explanation.

---

**5.** The "distribution list" attached to the Institutional Supplement shows that the supplement is not distributed to inmates on an individual basis. Rather, one copy is kept in each unit housing numerous prisoners and another copy is on file in the prison library. Noriega is housed in an annex separate from the units housing other inmates and does not have use of the prison library. It therefore appears that the Institutional Supplement was never shown or otherwise made available to Noriega.

Having informed Noriega that "a properly placed phone call to an attorney is not monitored," it was the responsibility of prison officials to clearly and explicitly explain what that phrase did not say and what more was required. Of particular concern is the absence of any explanation to Noriega of the importance of using the terms "privileged" or "unmonitored," words to which MCC attaches great significance despite its failure to put this requirement in writing. Although the court has no doubt that this is a matter of simple miscommunication and misunderstanding between the parties rather than the product of any deliberate deception, the underlying conclusion remains that Noriega was apparently never fully and unequivocally advised of the procedures which have been laid out for this court. It is worth noting that during a period spanning almost one year and encompassing over 1,400 phone calls, Noriega never requested an "unmonitored" or "privileged" call, and never asked to see a member of his unit team. While this is not proof that Noriega was unaware of the proper procedures for making an unrecorded attorney call, it might have alerted prison officials to this possibility and spawned a further inquiry into Noriega's understanding, or lack thereof, of these procedures. Conversely, one could also conclude that, as a more full review of certain of the tapes indicates, Noriega made no calls to attorneys which he felt were sufficiently secret to warrant these procedures. In any event, this confusion could have been avoided if prison officials had simply informed Noriega that *all* calls made on the telephone installed outside his cell, including calls to his attorneys whether properly made or not, were automatically recorded, and that unmonitored calls could be made only from a separate staff telephone used by prison officials. This simple instruction would have put Noriega on notice that all calls made from his telephone were being taped even without resort to explanations regarding unit team approval and the required invocation of specific words. At the very least, it would have corrected the misleading impression created by the notice on Noriega's telephone which suggests that unrecorded calls can be made from that particular telephone.

It should be emphasized that the court's findings on the issue of notification are based on a somewhat limited record. Because the lack of prejudice was decisive (see discussion *infra*), the parties did not present certain testimony which might have been helpful, such as that of Noriega's guards. It is therefore possible that a further development of the record would warrant an opposite conclusion from that reached here.[6] However, on the record before it, the court cannot say that Noriega was sufficiently informed of the procedures for making an unmonitored, unrecorded call so as make any expectation of privacy unreasonable.

Whether or not Noriega received adequate notice of these procedures would, of course, be irrelevant if in fact Noriega was actually aware that his calls to his attorneys were being monitored. In such case, Noriega could not claim that these conversations were intended to remain confiden-

---

6. The court notes, for example, that Noriega frequently abused his telephone privileges by calling the son of a defense team investigator and having him patch the call through to a third party in Panama, despite explicit notice that such calls were impermissible. If Noriega indicated to his guards that these were attorney calls, then he could claim no reasonable expectation of confidentiality with regard to any of his conversations with his lawyers or other members of his defense team; in this case, simply invoking the "attorney" label would not manifest an intent to engage in a privileged, confidential attorney-client communication. Again, this issue was not sufficiently developed for the court's consideration.

It is further noted that defense counsel have been inconsistent with respect to which particular persons fall within the attorney-client scope. If this is any indication of the kind of identification of the defense team provided to Noriega's guards, then Noriega may well have forfeited any expectation of privacy at least with respect to those members of the defense team whose status may have been unclear to MCC officials. It is Noriega's burden, and not MCC's, to identify those persons belonging to his defense team and whose conversations with him are intended to remain confidential.

tial, as required under the first prong of the test carved out by the Eleventh Circuit. The government points to two conversations between Noriega and one of his attorneys, Steven Kollin, in which Noriega reveals a reluctance to speak freely over the telephone and Kollin alludes to the possibility of the conversations being monitored.[7] Yet both conversations occurred shortly after, and directly concerned, an incident in which an unknown person surreptitiously videotaped Noriega in his cell at MCC and then attempted to sell the tape to local news stations. The conversations show that Noriega was extremely upset about the videotape and concerned with the security at MCC. Considered in this context, Noriega's and Kollin's statements could be interpreted as momentary and justifiable caution during a discrete period of uncertainty regarding overall security and privacy at MCC. The court is therefore reluctant to infer from these two conversations alone that Noriega never intended any of his attorney-client phone conversations to remain confidential. We do not foreclose this possibility. Irrespective of the problematical notification, it is difficult to believe that a person with vast experience in intelligence matters such as Noriega would harbor any illusions of privacy with respect to conversations made from a prison phone equipped with monitoring devices. Indeed, the harmless nature of Noriega's attorney-client conversations would be consistent with this conclusion. If resolution of Noriega's Sixth Amendment claim turned on his subjective intent, the inconclusive nature of the evidence presented so far on this issue is such that further testimony and evidence on this particular question

might be in order. The court, however, finds this unnecessary, as Noriega has not established the requisite prejudice needed to state a Sixth Amendment violation.

Because intrusions into the attorney-client relationship are not per se unconstitutional, establishing a Sixth Amendment violation requires some showing of prejudice in terms of injury to the defendant or benefit to the State. *Weatherford v. Bursey*, 429 U.S. 545, 558, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977).

In *Weatherford*, an undercover agent attended pretrial strategy sessions between the defendant and his lawyer in order to avoid raising suspicions about his true status. The agent never discussed the defendant's trial strategy or preparation with his superiors or the prosecution and limited his testimony to events occurring before these meetings. Since the defendant had failed to show a "realistic possibility of injury" to himself or "benefit to the State" as a result of the intrusion, the Court declined to find a Sixth Amendment violation. The Court noted that:

> Had Weatherford [the agent] testified at Bursey's trial as to the conversation between Bursey and Wise [Bursey's lawyer]; had any of the State's evidence originated in these conversations; had those overheard conversations been used in any other way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford, an undercover agent, the details of the Bursey–Wise conversations about trial preparations, Bursey would have a much stronger case.

429 U.S. at 554, 97 S.Ct. at 843 (footnote omitted).

---

7. In addition to these conversations, the government points to other conversations between Noriega and third parties in which Noriega speaks in cryptic, coded language and cautions others about saying too much over the telephone. These conversations, however, are irrelevant to the question of whether Noriega was aware that his *attorney* calls were being taped, since Noriega was explicitly advised that his third-party calls, unlike his attorney calls, were subject to monitoring and recording and could therefore be expected to use guarded language when conversing with third parties.

The only cryptic attorney-client conversation of which the court is aware is one between Noriega and a defense team investigator in Panama, which was previously identified in connection with the CNN litigation. Yet this conversation was clearly subject to taping in that it occurred in the course of a single phone call which included other conversations with third parties in Panama. That Noriega did not expect this clearly unprotected conversation to remain confidential does not, however, constitute a waiver of privacy with respect to those conversations which would be protected under MCC's policy.

Since there was no communication of information to the prosecution in *Weatherford,* the Court did not have occasion to determine the exact level and nature of prejudice required to state a Sixth Amendment violation. But from the discussion in *Weatherford* of what the defendant had failed to show, courts have identified the following factors to consider in determining whether the requisite amount of prejudice needed to establish a Sixth Amendment violation is present: (1) whether the government's intrusion was intentional; (2) whether the prosecution obtained confidential information pertaining to trial preparations and defense strategy as a result of the intrusion; and (3) whether the information obtained produced, directly or indirectly, any evidence used at trial, or was used in some other way to the defendant's substantial detriment. *See United States v. Kelly,* 790 F.2d 130, 137 (D.C.Cir.1986); *United States v. Steele,* 727 F.2d 580, 585 (6th Cir.), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984); *United States v. Brugman,* 655 F.2d 540, 546 (4th Cir.1981); *United States v. Irwin,* 612 F.2d 1182, 1187 (9th Cir.1980).

In this case, unlike *Weatherford,* confidential defense discussions were communicated to the prosecution team as a result of the intrusion; although the prosecutors themselves were not exposed to these conversations, the DEA case agents assisting the trial team, including agent Grilli, were. Yet the simple fact of communication is insignificant for Sixth Amendment purposes if there is no gain to the prosecution or adverse impact on the defendant as a result. Here, the only conversation which can be considered even remotely prejudicial is the conversation contained in the Blandon memo, in which Noriega and a defense investigator briefly discuss two potential government witnesses whose names had appeared in a recent newspaper account. At most, this discussion reveals that Noriega is at least minimally familiar with one of the witnesses, is not at all familiar with the other, and that the defense intended to investigate the latter witness. Yet Noriega has not shown how the disclosure of this information harms his defense or bene-fits the prosecution. The conversation was viewed as so insignificant by agent Grilli that he never bothered to convey it to the prosecutors and did not even remember the conversation until it was re-played for him by FBI officials investigating the disclosure of the tapes to CNN. Indeed, the tapes as a whole proved so useless in terms of investigative value that the government eventually abandoned its review. In short, there is nothing to suggest that the information contained in Noriega's attorney-client conversations, nor even in any other conversations, was in any way used by the prosecution.

Moreover, the receipt of Noriega's attorney-client conversations was not intentional. To the contrary, the prosecution team took positive steps to screen out any attorney-client conversations from the tapes subpoenaed from MCC. "Outside" persons were assigned the task of screening the tapes for any attorney-client conversations, and explicit instructions were given as to how these discussions were to be sealed and segregated from other conversations. When the lead prosecutor Pat Sullivan came across an attorney-client conversation in the Blandon memo, he refrained from reading the remainder of the conversation, ordered a further check, and never resumed reading the memo despite assurances that no attorney-client conversations had been discovered. While it is unclear why Noriega's conversations with his defense team were not recognized as such by the outside screeners and DEA agents reviewing the tapes, or by the agents briefed by Blandon, the fact remains that any exposure to these conversations was inadvertent.

■ There being no intentional intrusion, no benefit to the prosecution, and no harm to Noriega's defense, there was no prejudice and therefore no Sixth Amendment violation—much less the demonstrable level of prejudice required for dismissal of the indictment. *See United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) (dismissal of the indictment as a sanction for government intrusion into the attorney-client relationship is

inappropriate absent demonstrable prejudice to the defendant, or substantial threat thereof); *United States v. Bell*, 776 F.2d at 972–73 (same).[8]

## B. The Title III and Fourth Amendment Claims

In addition to the Sixth Amendment claim, Noriega contends that the government's review of his third-party, as opposed to his attorney-client, conversations violated Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–21, as well as his Fourth Amendment right to privacy.

Title III, the federal wiretapping statute, forbids the willful interception of wire communications, including telephone conversations, without prior judicial authorization. Although the Eleventh Circuit has yet to consider the application of Title III to the prison setting, other courts have held that the statute applies to prison monitoring of inmate phone calls. *See United States v. Amen*, 831 F.2d 373, 378 (2nd Cir.1987), *cert. denied*, 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988); *United States v. Paul*, 614 F.2d 115, 117 (6th Cir.), *cert. denied*, 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980); *Campiti v. Walonis*, 611 F.2d 387, 392 (1st Cir.1979); *Crooker v. United States Dep't of Justice*, 497

F.Supp. 500, 502 (D.Conn.1980). *But see United States v. Paul, supra* at 117–120 (J. Phillips, concurring in result) (arguing that Title III is coextensive with the Fourth Amendment's concern for privacy and therefore does not apply to the prison setting since inmates have a reduced expectation of privacy within the institution).[9] Assuming that it does, Noriega's claim is nonetheless largely foreclosed in the context of this action.

■ Preliminarily, the court notes that the interception of Noriega's third-party conversations was proper under two Title III exceptions. Section 2510(5)(a)(ii) of the statute permits interception by "an investigative or law enforcement officer in the ordinary course of his duties." Several courts have held that prison officials are "investigative or law enforcement officers" within the meaning of the statute, and that monitoring pursuant to an established and posted prison policy such as MCC's is in the officers' "ordinary course of duty" and thus within the ambit of § 2510(5)(a)(ii). *See United States v. Sababu*, 891 F.2d 1308, 1328–29 (7th Cir.1989); *United States v. Feekes*, 879 F.2d 1562, 1565–66 (7th Cir. 1989); *United States v. Paul*, 614 F.2d at 117; *United States v. Vasta*, 649 F.Supp. 974, 989 (S.D.N.Y.1986); *United States v.*

---

**8.** As noted by the District of Columbia Circuit, a prejudice analysis is employed at two levels in the Sixth Amendment context. First, some amount of prejudice is required in order to establish the existence of a Sixth Amendment violation, but the prejudice need not be "outcome determinative". Second, once a violation is established, the level of prejudice will determine the remedy, if any, which is required. *United States v. Kelly*, 790 F.2d at 138, ft. 6. *Cf. United States v. Bell, supra* (assuming a Sixth Amendment violation but declining to dismiss the indictment where the defendant suffered no injury as a result of the violation).

**9.** Under Judge Phillips' view, Noriega's third-party conversations would not even come within Title III's ambit since Noriega's knowledge that these calls were being monitored precludes any reasonable expectation of privacy with respect to these conversations. As the legislative history shows, Title III was enacted in response to the Supreme Court's rulings in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) and *Katz v. United States*, 389 U.S. 347,

88 S.Ct. 507, 19 L.Ed.2d 576 (1967), which subjected electronic surveillance to Fourth Amendment scrutiny. *See* S.Rep. No. 1097, 90th Cong., 2d Sess. 66 (1968), *reprinted in* 1968 U.S.Code Cong. & Ad.News 2112, 2161–63.

The difficulty with limiting Title III to the Fourth Amendment's scope of protection, which encompasses only those areas where a person has a legitimate expectation of privacy, lies in the statutory language itself. Thus, while Title III defines "oral communications" to exclude those conversations as to which there is no justifiable expectation of privacy, 18 U.S.C. § 2510(2), it did not so limit the definition of "wire communications" protected under the statute. *See* 18 U.S.C. § 2510(1). Accordingly, as regards "wire communications" such as those at issue here, Title III appears to afford greater protection than that accorded under the Fourth Amendment in that it covers those situations which may not justify an expectation of privacy.

As noted *infra*, the court need not decide this issue since, even assuming Title III applies, the recording of Noriega's third-party calls was appropriate under two of the statute's exceptions.

*Clark,* 651 F.Supp. 76 (M.D.Pa.1986); *Crooker v. United States Dep't of Justice,* 497 F.Supp. at 503.

■ It can perhaps be argued that the recording of Noriega's calls had less to do with prison security than with responding to the government's subpoenas, which were served on MCC shortly before the recording was initiated. If in fact the interception of Noriega's conversations was unrelated to any institutional considerations, then it would fall outside the scope of an MCC official's "ordinary course of duties." But in the absence of any suggestion or evidence to this effect, the court must presume that the recording was pursuant to routine prison policy applicable to all inmates. Noriega has been under the tightest security since his arrival at MCC, and it is difficult to believe that the security concerns permeating all other aspects of his confinement did not also extend to the recording of his telephone conversations. As long as the recording was based on legitimate security considerations, which must be assumed in view of MCC's established policy and absent proof to the contrary, the interception of Noriega's calls would fall within the ordinary duties of a prison official.

■ A second exception to the statute allows interception where "one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c). On facts substantially similar to those pertinent here, the Second Circuit has found implied consent under Title III where an inmate uses a prison telephone after being advised that such phones are subject to monitoring, and where notice is prominently posted warning that use of the institution's telephones constitutes consent to monitoring. *See United States v. Willoughby,* 860 F.2d 15, 19–20 (2nd Cir.1988), *cert. denied,* 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989); *United States v. Amen,* 831 F.2d at 379. *See also Griggs–Ryan v. Smith,* 904 F.2d 112 (1st Cir.1990) (tenant's use of landlady's telephone after unambiguous notice that all incoming calls were being recorded constituted implied consent to the interception of his conversa-

tion). The orientation manual, the telephone sticker, and the consent form all contained such warnings. Further, Noriega's signature on a document explicitly stating that use of the prison's telephones constituted consent to monitoring could be construed as express consent to the recording of his third-party calls. *See Willoughby,* 860 F.2d at 20.

Noriega argues that his consent was limited to monitoring for purposes of prison security and not as a means of assisting the prosecution in preparing its case against him. In support of this argument, Noriega relies on the Eleventh Circuit's decision in *Watkins v. L.M. Berry & Co.,* which held that consent within the meaning of Title III "is not necessarily an all or nothing proposition; it can be limited." 704 F.2d 577, 582 (11th Cir.1983). *Watkins* is distinguishable from the case at bar. In *Watkins,* an employee consented to the monitoring of her personal calls only for such time as necessary for her employer to determine that they were not business-related. Thus, the plaintiff in *Watkins* did not consent to *any* monitoring of her personal calls beyond a certain point, and any monitoring over and above that point clearly exceeded the scope of permission granted by the plaintiff as a condition of her employment. *Id.* at 581. Here, Noriega's consent extended to the recording of his third-party conversations in their entirety, rendering their interception squarely within the scope of his consent.

■ Although framed in terms of consent to monitoring, the thrust of Noriega's complaint lies not in the interception of his third-party conversations by MCC, but rather in the disclosure of their contents to the prosecution team. He argues that, while these conversations may have been properly recorded by prison officials for security reasons, it was reasonable for him to expect that they would not be shared with prosecutors and agents in search of investigative leads and inculpatory material. Whatever the merits of this claim, it is clear that where the alleged violation consists solely of an improper disclosure or use of otherwise legally inter-

cepted communications, the only remedy under Title III is a civil action for damages. 18 U.S.C. § 2520. *See United States v. Cardall,* 773 F.2d 1128, 1134 (10th Cir. 1985) (Title III's civil damage remedy "must be viewed as the only sanction against illegal disclosure of intercepted communications available to the aggrieved party."); *Resha v. United States,* 767 F.2d 285, 289 (6th Cir.1985) (the remedy for improper disclosure under Title III is a civil action for damages), *cert. denied,* 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 716 (1986). As such, the issue presented by Noriega's Title III claim is not properly raised in the motion at hand and thus not properly before the court.[10]

 The Fourth Amendment claim fares no better. It is well established that the Fourth Amendment protects only those subjects or areas in which there is a legitimate expectation of privacy, *see Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979), and that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Id.* at 743–44, 99 S.Ct. at 2582. This is true *"even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." United States v. Miller,* 425 U.S. 435, 443, 96 S.Ct. 1619, 1624, 48 L.Ed.2d 71 (1976) (emphasis added). There can be no doubt that Noriega had no reasonable expectation of confidentiality in his third-party conversations, as the various notices and the consent form all explicitly stated that these calls were subject to monitoring and recording. Nor was there even a subjective expectation of confidentiality; Noriega often warned persons on the other end of these calls not to

speak about sensitive matters over the telephone and repeatedly employed coded, cryptic language during these discussions. The Fourth Amendment is simply inapplicable to these conversations.

C. Rules 17 and 16

 The court does find that the prosecution's use of trial subpoenas to obtain the recordings and its failure to disclose the conversations in its possession violated Rules 17 and 16 of the Federal Rules of Criminal Procedure.

The subpoenas *duces tecum* served on MCC suggested that the tapes were sought pursuant to court hearings when in fact no proceedings in this case were scheduled on the dates indicated in the subpoenas. Clearly, the prosecution intended to use the recordings, if at all, either at trial or as a means for developing investigative leads which would lead to evidence producible at trial, and the return dates on the subpoenas were selected not to reflect actual court dates but rather to enable the prosecution to examine these recordings prior to trial in order to obtain additional discovery against the defendant.

 Rule 17(c), which covers subpoenas for documents and other materials, is not a discovery device. *Bowman Dairy Co. v. United States,* 341 U.S. 214, 220, 71 S.Ct. 675, 679, 95 L.Ed. 879, 885 (1951). It is merely an aid for obtaining relevant and evidentiary materials which the moving party plans to use at trial or in some other court proceeding. *United States v. Cuthbertson,* 630 F.2d 139, 144 (3rd Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981). *See also United States v. Nixon,* 418 U.S. 683, 699–700, 94 S.Ct. 3090, 3103, 41 L.Ed.2d 1039 (1974).[11]

---

**10.** Indeed, the only other remedies provided for under Title III are suppression of evidence, 18 U.S.C. § 2518(10)(a), and criminal sanctions, 18 U.S.C. § 2511(1). Thus, the extreme remedy of dismissal of the indictment which Noriega seeks here would have to be based on governmental misconduct over and above a Title III violation. This case simply does not present the kind of outrageous or repeated misconduct that would justify that result.

**11.** Although the Supreme Court has recently rejected strict requirements of relevancy, specificity, and admissibility for subpoenas *duces tecum* issued in connection with grand jury investigations, these standards remain applicable to trial subpoenas such as those at issue here. Whereas the investigatory function performed by a grand jury requires that it be given broad latitude in gaining access to all information which might bear on its investigation, the purpose of a trial subpoena is limited to obtaining admissible evi-

In accordance with the purpose of the Rule, enforcement depends on whether the subpoena reflects a genuine effort to obtain identifiable and relevant evidence or instead constitutes a broad "fishing expedition" which seeks to use the Rule as a means for obtaining additional discovery. *Cuthbertson*, 630 F.2d at 144; *Bowman Dairy Co. v. United States*, 341 U.S. at 220–21, 71 S.Ct. at 678–79. If the moving party cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful will turn up, this is a sure sign that the subpoena is being misused.

In this case, the prosecution could have no idea what was on the tapes since they did not even exist when the first subpoena was issued on February 8, 1990. It simply hoped to find something of possible value which might bolster its case against Noriega. The subpoenas thus constituted a broad dragnet aimed at bringing in anything and everything contained in the recordings regardless of their identifiable or foreseeable significance to the charges at issue. This is precisely the kind of unwarranted expedition which Rule 17(c) does not permit. As a result, a prison recording policy premised on legitimate security needs was transformed into freewheeling and open-ended discovery for the prosecution, though useless to be sure. That the recording itself was appropriate did not thereby grant the prosecution license to rummage through Noriega's conversations at will.

Nor was there any justification for the examination of Noriega's conversations without prior court knowledge and authorization. Rule 17(c) unambiguously states that materials subject to subpoena are producible prior to the time they are to be offered in evidence only if the court so directs.[12] This is to ensure that subpoenas are not used for impermissible discovery, which is more likely to be the case when advance production of materials is sought instead of the usual production at time of trial or other proceeding in which they are to be used in evidence. As has been previously observed, the provision leaving advance production to the court's discretion "is no mere technicality. It is a vital protection against misuse or improvident use of such subpoenas *duces tecum.*" *United States v. Ferguson*, 37 F.R.D. 6, 8 (D.D.C. 1965).[13]

■ While it is generally assumed that courts can protect against abuse through rulings on motions to quash or modify, *see* 2 Wright *Federal Practice and Procedure: Criminal 2d* § 274 at 154–55, this in turn assumes that the recipient of the subpoena has some interest or incentive in filing such a motion. Yet it is wishful thinking to expect that prison officials will either oppose a government-requested subpoena which implicates an incarcerated defendant's interests or else enable the defendant to file his own motion to quash by notifying him that such subpoenas have been issued. If anything, the coinciding interests of prosecutors and prison authorities in law enforcement renders these subpoenas mere formalities and all but guarantees that prosecutorial overreaching such as that present here will go unchecked,[14] a reality which must have been appreciated by the prosecution in this case and which

---

dence relevant to specific offenses already identified. *See United States v. R. Enterprises, Inc.,* — U.S. —, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991).

**12.** The relevant provision is as follows: "The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys."

**13.** The government's argument that Noriega lacks standing to challenge a subpoena served on a third party is off point. The court need not look to any litigant in order to quash a subpoena which seeks to usurp the court's exclusive authority to permit production of materials prior to trial.

**14.** Not surprisingly, the Bureau of Prisons was considerably less accommodating when served with a subpoena obtained by Noriega in connection with this action, which it promptly moved to quash.

**1494**

should have made manifest the need for prior court authorization. Given the potential for abuse apparent to the court, it is clear that the limitation on advance production of subpoenaed materials must be strictly enforced particularly in this context. Accordingly, the court holds that trial subpoenas may not be used to obtain a defendant's prison-recorded conversations prior to the time they are to be offered in evidence unless leave of court is obtained.

▮▮▮▮ The government also ran afoul of Rule 16 and the court's standing discovery order in not disclosing the subpoenaed conversations to the defense. Federal Rule of Criminal Procedure 16(a)(1)(A) entitles a defendant to discover "any relevant written or recorded statements of the defendant" in the government's possession. The relevancy requirement is a relatively low hurdle to clear where a defendant seeks production of his own statements, with disclosure "practically a matter of right even without a showing of materiality." *United States v. Haldeman*, 559 F.2d 31, 74 n. 80 (D.C.Cir.1976) (en banc), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). *See also United States v. Yunis*, 867 F.2d 617, 624 (D.C.Cir. 1989) (affording the defendant the "near presumption of relevance of his own statements"); *United States v. Bailleaux*, 685 F.2d 1105, 1114 (9th Cir.1982) (advocating a broad interpretation of the relevancy requirement under Rule 16(a)(1)(A)). In accordance with this view of the Rule, the standing discovery order entered by this court requires production of written or recorded statements of the defendant without reference to their relevancy. Even if the government construed this provision of the discovery order to implicitly incorporate the relevancy requirement contained in Rule 16(a)(1)(A), the first batch of tapes was reduced to an edited set of conversations deemed to be "potentially relevant," and the conversation concerning potential government witnesses is irrefutably rele-

vant to the charges at hand. Pursuant to Rule 16(c) [15] and the court's standing discovery order, the government was under a continuing obligation to produce material subject to discovery. Its withholding of Noriega's recorded statements from both the defendant and the court was in violation of this obligation.

▮▮▮ Nonetheless, it is clear that these violations have not resulted in any prejudice to Noriega. The subpoenaed conversations consisted mostly of incomprehensible dialogue, discussions of Panamanian politics, and occasional trivia which contained nothing of value to the prosecution. Even assuming *arguendo* that they had, the government has produced these conversations to the defense pursuant to a separate court order, thereby precluding the "trial by ambush" which results when a defendant's statements hidden from discovery are suddenly used against him at trial. *See United States v. Noe*, 821 F.2d 604, 608 (11th Cir.1987). Absent any prejudice to the defendant, dismissal of the indictment is plainly inappropriate.

### III. CONCLUSION

In view of the above findings and conclusions, it is the order of this court that the motion to dismiss be and the same is DENIED.

DONE AND ORDERED.

---

**15.** Rule 16(c) provides as follows:
 **Continuing Duty to Disclose.** If prior to or during trial, a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection under this rule, such party shall promptly notify the other party or that other party's attorney or the court of the existence of the additional evidence or material.