46 A.3d 550

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
EDWARD RONALD ATES A/K/A RON WAVERLY,
DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted April 17, 2012—Decided May 17, 2012.

Before Judges FISHER, NUGENT and CARCHMAN.

*Lesnevich & Marzano–Lesnevich,* attorneys for appellant (*Walter A. Lesnevich,* of counsel; *Mr. Lesnevich* and *Michael R. Mildner,* on the brief).

*John L. Molinelli,* Bergen County Prosecutor, attorney for respondent (*Catherine A. Foddai,* Senior Assistant Prosecutor, of counsel and on the brief).

*Jeffrey S. Chiesa,* Attorney General, amicus curiae (*Mary E. McAnally,* Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

Defendant appeals from his conviction for the first-degree murder, *N.J.S.A.* 2C:11–3(a)(1), of his former son-in-law, Paul Duncsak, on August 23, 2006, for which defendant received a life sentence subject to a parole ineligibility period of more than sixty-

three years. Defendant argues that the New Jersey Wiretapping and Electronic Surveillance Control Act (the Wiretap Act), *N.J.S.A.* 2A:156A–1 to –34, is unconstitutional because it permits the interception of telephone calls between individuals located outside New Jersey. He also argues that the trial judge imposed an inadequate remedy as a result of an invasion of the attorney-client privilege during the State's interception of defendant's telephone calls. We reject these and defendant's other arguments and affirm.

I

Evidence adduced at a twenty-three day trial revealed the following.

Defendant's daughter, Stacey, and Paul Duncsak were married in 1999 and had two children. They divorced in 2003.

Stacey did not fare well after the divorce. Child custody litigation resulted in Paul being named the parent of principal residence. At the time of Paul's murder, Stacey was unemployed and experiencing health and financial difficulties. On the other hand, Paul met Lori Adamo–Gervasi in 2005. Paul and Lori began dating in 2006 and became engaged with plans for a 2007 wedding in Cape May.

Paul and Lori had decided that she and her son would move into Paul's house in Ramsey on August 24, 2006, while they attempted to sell Lori's house in Wyckoff. In the meantime, from August 8 to the 23, Paul stayed at Lori's house. Paul would go to work from Lori's in the morning, stop at his house in Ramsey in the evening to check his e-mail and feed his parrot, and then return to Lori's for dinner and to spend the rest of the night. Because the Ramsey house was unoccupied, Paul did not leave the air conditioner on and always kept the doors locked.

Defendant lived in Port Lucie, Florida, with his wife, Dottie, in an RV on property owned by Evelyn Walker, the couple's other daughter. Evelyn lived on the same property in a house equipped

with a computer and an internet connection, which defendant often utilized.

In early August 2006, defendant and Dottie began a trip north. On August 13, 2006, while in Wytheville, Virginia, they stopped at Walmart and purchased a TracFone cell phone and a card containing 120 minutes of service. The phone was activated on August 14, 2006. Records for the TracFone phone showed the first call was made on August 14, 2006, to the Pine Hill RV Campground in Kutztown, Pennsylvania. On the same day, "Ron Waverly" [1] of Vero Beach, Florida, paid cash to stay at the campground from August 16 to 18, 2006.

On August 14, 2006, after checking in at the campground, defendant called an Enterprise Rent-a-Car in Allentown, Pennsylvania and later that day rented a Dodge Durango, selecting an option that allowed them to drive into New Jersey. Defendant returned the rented Dodge Durango to the Allentown Enterprise facility on August 15, 2006, and requested a car with better mileage; the Durango had been driven 500 miles in one day. [2] As a replacement, defendant received a Hyundai Sonata, which was driven approximately 1,000 miles by the time it was returned on August 18, 2006. [3]

Around 1:30 p.m. on August 23, 2006, Lori and a colleague, Helen Nikiforakis, went to Paul's house so Lori could show Helen where she would soon be living. Upon arriving, Helen noticed it was exceptionally warm inside and asked Lori to turn on the air conditioning; Lori said they would not be there long enough to justify it. Lori gave Helen a tour of the house that included a

---

[1] Ron is defendant's middle name. Waverly is a town in Louisiana close to where he grew up.

[2] On August 14, 2006, a Ramsey police officer's routine check of license plates revealed that this vehicle was in Ramsey at that time.

[3] On August 16 2006, defendant twice called the Wyckoff ReMax office, inquiring about the status of Lori's house.

visit to the basement; Lori noticed that a furnace door, which was always left open for ventilation, was closed. This struck Lori as unusual. Lori then intended to show Helen a unique bathroom in the house but found the door was locked. This also seemed highly unusual to her. Lori and Helen left Paul's house around 2:30 p.m. While locking the door, Lori noticed a Burger King wrapper in the garbage outside that neither she, Paul, nor the children had placed there.

Around 6:20 p.m., Paul called Lori to tell her he was driving home to feed his parrot. Lori remained on the phone with Paul as he pulled into the driveway and exited his vehicle. Paul noticed the Burger King wrapper and mentioned to Lori that she must have left him a present; he also stated that Lori had left on the air conditioner. Suddenly, Paul shouted "no, oh no" then stopped speaking; Lori heard the bird scream and a loud thud. While still connected with Paul's cell phone, Lori tried calling the Ramsey house line from her house phone; no one answered. Lori's cell phone remained connected to Paul's as she dialed 9-1-1 from her house phone. While explaining to the 9-1-1 operator what had occurred, the line to Paul's cell phone went dead.

When police arrived at Paul's house, they found the doors were locked. A door was breached, and Paul's body was found in a pool of blood. Because there was no evidence of a forced entry, police were initially confused as to how someone could have entered until they found that a set of French doors leading from the master bedroom to the deck were unlocked.

At approximately 10:30 p.m. on August 23, 2006, Detective John Haviland went to Stacey's home. When he arrived, he observed a dark blue Ford Explorer in her driveway.[4] Stacey explained that the Explorer was a loaner she was using while her vehicle was

---

[4] Approximately two hours before the murder, the son of one of Paul's neighbors arrived at his parent's house and noticed a blue Ford Explorer parked on the apron of Paul's driveway; as the neighbor turned into his parent's driveway, the Explorer drove away.

being repaired. Detective Haviland told Stacey that Paul was dead but did not advise her of the manner or cause of death. Detective Haviland returned later that evening to obtain contact information for defendant. Stacey provided defendant's cell phone number and her sister Evelyn's home phone number.

After a number of attempts, Detective Haviland reached Evelyn around 4:45 a.m. on August 24 and spoke to Dottie, who informed him that defendant was in Louisiana visiting his sick mother, Myra, and that there was no way to contact him because he left his cell phone in Florida. Police made several attempts to reach defendant by telephone.

On August 24, 2006, around 6:45 p.m., defendant left a voicemail for Detective Haviland providing his mother's telephone number as the means by which he could be contacted. Later that evening, defendant told Detective Haviland he left Florida the afternoon of August 20 and had driven to Louisiana, arriving on Tuesday, August 22, to visit his mother. Defendant said he could not document his trip because he paid in cash, slept in his car, and left his cell phone at home.

An autopsy determined that Paul sustained ten gunshot wounds resulting from a minimum of seven shots, none at close range. Examination of the locks at Paul's house revealed they had been aggressively picked shortly before the murder.

Search warrants were executed on defendant's RV and Evelyn's home in Florida. Police seized six computers, defendant's .22 caliber handgun, ammunition, and the door locks from French doors in Evelyn's house. Forensic tests on a hard drive from a computer retrieved from Evelyn's home revealed that in 2006, a company in the business of selling lock-picking sets received an order from someone using the computer and sent such a kit to "E. Ates." Several locks retrieved from Evelyn's house bore evidence that someone had used lock-picks on them. Additional tests on the computer revealed that Google searches were performed about "how to commit the perfect murder" and led to an article discussing mistakes made in a murder. The article recommended the use

of an alias and a .22 caliber weapon. Several other searches yielded results on lock-picking. Defendant also purchased two books through Amazon: "Workbench Silencers: the Art of Improvised Designs" and "More Workbench Silencers."

Defendant testified at trial. He asserted that by July 2006 he had no relationship with Paul and no reason to dislike him. Defendant explained that in August 2006, he learned Stacey's condominium unit was in danger of being foreclosed. He also testified that Stacey was "mentally distressed" because of her slow recovery from Bell's Palsy, and because of her concern that she might not "be able to live up to her part of the children's vacation that year" while "Paul was taking them on a better vacation."

According to defendant, in August 2006, he and Dottie intended to visit Stacey but by the time they had reached West Virginia, Stacey seemed very happy and was enjoying her time with the kids, so they lied to her and told her they were going to Louisiana to visit his mother, Myra. Instead, however, they found and stayed at a campground in Pennsylvania. Defendant explained that, feeling guilty about not visiting Stacey, he rented a car and decided to drive to Stacey's house to see how far away it was but then turned around and left without seeing her. They also drove past Paul's house at this time. According to defendant, he and Dottie returned the rental car because they wanted a smaller car. Defendant said that he and Dottie then traveled to Gettysburg, Valley Forge, the Delaware Water Gap, the Pocono Mountains, and around the Catskill Mountains. Upon returning to Florida, defendant left by himself to go to Louisiana to visit his mother. Defendant testified that he slept in his car instead of a hotel and arrived in Louisiana around 6:30 p.m. on August 23, 2006.

Defendant responded to forensic evidence obtained from his hard drive that revealed he had researched how to commit the perfect murder. Defendant said he heard of a book about this subject on Fox and Friends one morning and it piqued his interest. He acknowledged that he did an internet search regarding how to build a silencer and about lock-picking techniques

because the book had discussed how easily obtainable that information was on the internet and, as a concerned parent, he wanted to see if that was true.

The defense also asserted that defendant could not have committed the murder because he was in Louisiana approximately twenty-fours hours after Paul was gunned down.[5] The State offered testimony of a police officer who, shortly before trial, drove a Hyundai Sonata from Ramsey to Sibley, Louisiana, in twenty-one hours and thirty-four minutes, to demonstrate that it was not impossible for defendant to have been in Ramsey at the time of the murder and in Sibley, Louisiana the next evening.

## II

Defendant was arrested on June 12, 2007. He was indicted on September 28, 2007, and charged with: first-degree murder, *N.J.S.A.* 2C:11–3(a)(1) and (2) (count one); first-degree felony murder, *N.J.S.A.* 2C:11–3(a)(3) (count two); second-degree burglary, *N.J.S.A.* 2C:18–2 (count three); second-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4(a) (count four); third-degree possession of a firearm without a permit, *N.J.S.A.* 2C:39–5(b) (count five); third-degree conspiracy to hinder apprehension, *N.J.S.A.* 2C:5–2 (count six); fourth-degree obstructing the administration of law, *N.J.S.A.* 2C:29–1 (count eight); and third-degree witness tampering, *N.J.S.A.* 2C:28–5 (count nine).

Prior to trial, there was considerable litigation regarding the wiretaps. Judge Harry G. Carroll denied defendant's motion to exclude or suppress wiretapped telephone communications between or among individuals not located in New Jersey. Defendant also unsuccessfully argued that the Wiretap Act was unconstitutional because it permitted New Jersey authorities to act outside their jurisdiction by listening in on communications between individuals with no connection to New Jersey.

---

[5] Paul was murdered at approximately 6:30 p.m. on August 23 and defendant telephoned Detective Haviland from Louisiana at 6:45 p.m. on August 24.

Upon learning that conversations between defendant and his attorney had been recorded by the prosecutor's office as part of their wiretap operation, defendant moved to dismiss the indictment because twenty-three conversations between defendant and his attorney were recorded. The court found with respect to all but call # 278 that the police used proper minimization procedures, which shut down the recordation of audio portions of the conversation resulting in only "dead air" being audible on the recording. Call # 278, which occurred on October 23, 2006, however, was recorded in its entirety.

The judge conducted an evidentiary hearing to develop the issues raised and eventually denied the motion to dismiss the indictment. Judge Carroll found that call # 278 fell within the attorney-client privilege and was inadvertently but unlawfully intercepted. The judge also found that this was an isolated event, that no one at the prosecutor's office listened to call # 278, and that only a portion of the conversation regarded a possible defense. Although troubled by the violation and the State's failure to bring the violation to the attention of the court or defense counsel, Judge Carroll nevertheless determined that dismissal was not the proper remedy. Instead, the judge found that these circumstances tainted the wiretap operation from that point forward and, as a result, suppressed call # 278 and all calls thereafter intercepted.[6]

### III

The trial occurred over the course of twenty-three days, during which the State detailed the various events summarized briefly above.

The jury found defendant guilty on all counts.

---

6 Call # 278 was never played for the grand jury and the assistant prosecutor who tried the case never listened to it.

At sentencing, defendant's convictions for felony murder and second-degree possession of a weapon for an unlawful purpose were merged into the conviction for first-degree murder, for which the judge imposed a life sentence, subject to a sixty-three-year-and-nine-month period of parole ineligibility. Defendant was also sentenced to a concurrent ten-year prison term on the second-degree burglary conviction and a concurrent five-year prison term on the third-degree possession of a weapon without a permit conviction. The judge also merged the conviction for third-degree conspiracy to commit the crime of hindering apprehension and the conviction for fourth-degree obstructing the administration of law into the conviction for third-degree tampering with a witness and sentenced defendant to a consecutive five-year prison term.

Defendant appealed, arguing that: (a) the New Jersey Wiretap Act is unconstitutional; (b) the remedy imposed by Judge Carroll as a result of the recording of an attorney-client conversation was inadequate; (c) the prosecutor's summation regarding defendant's medical expert was improper and caused prejudice; (d) the admission into evidence of a reenactment drive was prejudicial; and (e) the cumulative effect of these errors required reversal. We reject all these arguments.

## A

Defendant argues that the Wiretap Act is unconstitutional because it allows the interception by New Jersey law enforcement personnel of telephone calls between or among individuals not located within New Jersey's boundaries. The State responds that such interceptions are lawful so long as the interception occurs within New Jersey.

■ This issue has not been previously addressed by our courts. Although defendant has not clearly defined the constitutional nature of his argument, we assume that defendant's contention is that when law enforcement exceeds the scope of the Act it causes a violation of his constitutional privacy, which is protected, in this context, by the Fourth Amendment and our similar state constitu-

tional provision. In this setting, our Supreme Court has held that the Wiretap Act must be "strictly construed" in order to "afford maximum safeguards for individual privacy." *State v. Catania*, 85 *N.J.* 418, 437, 427 *A.*2d 537 (1981); *see also State v. Worthy*, 141 *N.J.* 368, 379-80, 661 *A.*2d 1244 (1995); *State v. Cerbo*, 78 *N.J.* 595, 604, 397 *A.*2d 671 (1979); *In re Wire Communication*, 76 *N.J.* 255, 260, 386 *A.*2d 1295 (1978). In addition, although the state may grant greater privacy rights to individuals, it may not protect less than the privacy rights guaranteed by the federal constitution. Accordingly, the Wiretap Act loses its constitutionality when it permits greater intrusion into an individual's privacy rights than permitted by federal wiretap law, which is "paramount" and "binds federal and state officials alike, setting a threshold that may not be lowered." *State v. Minter*, 116 *N.J.* 269, 274, 561 *A.*2d 570 (1989) (citing *Benanti v. United States*, 355 *U.S.* 96, 104-06, 78 *S.Ct.* 155, 159-60, 2 *L.Ed.*2d 126, 132-33 (1957)). As a result, defendant's constitutional argument is dependent upon whether the terms of the Wiretap Act itself were exceeded or whether the Act has a greater reach than permitted by federal law.

Put in context, defendant contends that the State could not make use of intercepted calls between defendant, while he was in Florida, and his mother or sister, while they were in Louisiana. The State argues that these intercepted calls were lawfully obtained because law enforcement officials were physically in New Jersey when they were intercepted and that so long as the listening post was in New Jersey, the interceptions were permitted by both the Wiretap Act and federal wiretap law.

■ Defendant does not seriously argue that the Wiretap Act precludes the intercepting of calls between persons outside New Jersey when the listening post is in New Jersey. The Wiretap Act states that "an order authorizing the interception of a wire, electronic or oral communication may be executed at any point of interception within the jurisdiction of an investigative or law enforcement officer executing the order." *N.J.S.A.* 2A:156A-12(h). "Point of interception" is defined as "the site at which the

investigative or law enforcement officer is located at the time the interception is made." *N.J.S.A.* 2A:156A–2(v). Accordingly, the Wiretap Act expressly authorized the interception of telephone calls between individuals in Florida and Louisiana because the listening post was in this State.

■ This leads to the second aspect of the constitutional argument. That is, defendant contends that the so-called extraterritorial reach of the Act, described above, is unconstitutional because it "eradicates all jurisdictional boundaries between the states" and "usurps [f]ederal authority." We reject these contentions because the Act requires a nexus with New Jersey by insisting that, at the very least, the listening post be located in New Jersey. And this does not "usurp [f]ederal authority" because federal law permits the same thing.

In enacting the Omnibus Crime Control and Safe Streets Act, 18 *U.S.C.A.* §§ 2510–2520, Congress declared that a judge may enter an order "authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting," 18 *U.S.C.A.* § 2518(3), and defined intercept as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device," 18 *U.S.C.A.* § 2510(4). These provisions have been interpreted as authorizing a federal judge to lawfully permit the interception of calls where the wiretapped telephones were either located or where the calls were aurally acquired within the judge's jurisdiction. For example, in *United States v. Nelson,* 837 *F.*2d 1519, 1527 (11th Cir.), *cert. denied,* 488 *U.S.* 829, 109 *S.Ct.* 82, 102 *L.Ed.*2d 58 (1988), the court affirmed an order permitting interception where the wiretapped telephones were in but the listening post was outside the district judge's jurisdiction, and in *United States v. Rodriguez,* 968 *F.*2d 130, 135–36 (2d Cir.), *cert. denied,* 506 *U.S.* 847, 113 *S.Ct.* 139, 121 *L.Ed.*2d 92 (1992), the court affirmed a wiretap order that was issued by a New York district judge where the listening post was in New York but the wiretapped telephone was in New Jersey.

The *Rodriguez* court held that Congress intended that "the place where the contents of a wire communication are first to be heard and understood by human ears, other than those of the parties to the conversation, is the situs of an interception." *Id.* at 136. All other courts of appeals that have considered the issue have reached the same conclusion. *See United States v. Luong,* 471 *F.*3d 1107, 1109 (9th Cir.2006), *cert. denied,* 552 *U.S.* 1009, 128 *S.Ct.* 531, 169 *L.Ed.*2d 371 (2007); *United States v. Ramirez,* 112 *F.*3d 849, 852 (7th Cir.), *cert. denied,* 522 *U.S.* 892, 118 *S.Ct.* 232, 139 *L.Ed.*2d 163 (1997); *United States v. Denman,* 100 *F.*3d 399, 403 (5th Cir.1996), *cert. denied,* 520 *U.S.* 1121, 117 *S.Ct.* 1256, 137 *L.Ed.*2d 336 (1997); *United States v. Tavarez,* 40 *F.*3d 1136, 1138 (10th Cir.1994).

We, thus, reject defendant's argument that the Wiretap Act is unconstitutional because of its so-called extraterritorial reach.

B

Defendant argues the trial court erred by not dismissing the indictment after finding the prosecutor's office unlawfully recorded a conversation between defendant and his attorney.

In reviewing that determination, we are obligated to defer to the judge's factual findings because they are supported by substantial credible evidence. *State v. Mann,* 203 *N.J.* 328, 336, 2 *A.*3d 379 (2010); *State v. Elders,* 192 *N.J.* 224, 243, 927 *A.*2d 1250 (2007). We also reject defendant's argument regarding the legal conclusions drawn from those facts substantially for the reasons set forth by Judge Carroll in his cogent and thoughtful written opinion. *State v. Ates,* 426 *N.J.Super.* 614, 46 *A.*3d 605 (Law Div.2009).

C

Defendant argues the prosecutor's characterization of his medical expert's testimony as "preposterous" denied him a fair trial. We disagree.

Dr. Michael Farber, who was qualified as an expert in internal medicine, testified that it was "highly improbable" that defendant could drive the twenty-one hours from Ramsey to Sibley, Louisiana, in one sitting because he suffered from sleep apnea. The prosecution argued in its summation that

[C]ommon sense says [Dr. Farber's testimony] ... ought not to be accorded any weight by you. And basically, what he has tried to posture is that this [d]efendant is essentially unable to kill because of his physical condition; *an absolutely preposterous notion on its face.* That he is unable to pull a trigger; *absolutely preposterous on its face.*

[ (Emphasis added) ]

Defendant did not object to these remarks at the time.[7] As a result, in examining defendant's argument we are guided by the plain error standard, which requires that we disregard this claim of error unless it was clearly capable of producing an unjust result. *R.* 2:10–2; *see State v. Black,* 380 *N.J.Super.* 581, 592, 883 *A.*2d 1065 (App.Div.2005) *certif. denied,* 186 *N.J.* 244, 892 *A.*2d 1291 (2006). In other words, a conviction will be reversed under this standard only if the error is "sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached." *State v. McGuire,* 419 *N.J.Super.* 88, 106–07, 16 *A.*3d 411 (App.Div.) (internal quotation omitted), *certif. denied,* 208 *N.J.* 335, 27 *A.*3d 948 (2011). Comments during summation to which there is no objection are generally not considered prejudicial. *State v. Frost,* 158 *N.J.* 76, 83, 727 *A.*2d 1 (1999); *State v. Atwater,* 400 *N.J.Super.* 319, 337, 947 *A.*2d 175 (App.Div.2008).

Prosecutors are entitled to forcefully advocate the State's position. *State v. Koskovich,* 168 *N.J.* 448, 489, 776 *A.*2d 144 (2001). They are not, however, entitled to cast unjustified aspersions on the defense. *State v. Smith,* 167 *N.J.* 158, 177, 770 *A.*2d 255 (2001). To that end, we have held that a prosecutor's characterization of a witness's testimony as "absolutely preposterous"—

---

[7] The prosecutor also characterized Dr. Farber's theory as "nonsense." Defendant did not object to that statement when it was made nor has he argued in this appeal that this comment was improper.

the words in question here—is improper. *State v. Acker*, 265 *N.J.Super.* 351, 356, 627 *A.*2d 170 (App.Div.), *certif. denied*, 134 *N.J.* 485, 634 *A.*2d 530 (1993).

Even when an improper comment is made, as here, we must consider its context to determine whether the prejudicial effect warrants reversal. *Atwater, supra*, 400 *N.J.Super.* at 335, 947 *A.*2d 175. We are satisfied that the prosecutor's remark here was clearly not capable of producing an unjust result. The prosecutor's summation relied on the voluminous evidence introduced by the State implicating defendant in the murder of his former son-in-law, only some of which we have outlined earlier in this opinion.

In light of the considerable evidence of guilt and the appropriate arguments otherwise made by the prosecutor during his summation, we conclude that the comment that Dr. Farber's testimony was "absolutely preposterous," although improper, was insufficient to raise a reasonable doubt that it led the jury to a verdict it would not have otherwise reached. Indeed, the failure to object gives rise to an inference that the defense did not view the remark as prejudicial. *Frost, supra*, 158 *N.J.* at 83, 727 *A.*2d 1; *Atwater, supra*, 400 *N.J.Super.* at 337, 947 *A.*2d 175.[8]

D

After the judge ruled prior to trial that Mapquest directions calculating the time required to drive from Ramsey to Sibley, Louisiana, was inadmissible hearsay, two Bergen County detectives drove the route on August 19, 2009—the same time of year defendant was alleged to have driven to Sibley three years earlier. According to Detective Christiana, the trip took twenty-one hours and thirty-four minutes. Defendant unsuccessfully objected to the admission of this testimony at trial, arguing that testimony re-

---

[8] Any other contentions regarding the prosecutor's arguments as to the weight or sufficiency of Dr. Farber's testimony that may be discerned from defendant's arguments in his brief are without sufficient merit to warrant discussion in a written opinion. *R.* 2:11–3(e)(2).

garding the reenactment was highly prejudicial because the State did not inform him in advance it would be conducting such a reenactment and withheld the result of the experiment for an unreasonable period of time. Because appellate courts do not second guess a trial judge's admission or exclusion of evidence absent an abuse of discretion, *State v. Buda*, 195 *N.J.* 278, 294, 949 *A.*2d 761 (2008), we reject defendant's contention.

Evidence is relevant if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401. Relevant evidence, as a general matter, is admissible unless "its probative value is substantially outweighed by the risk of . . . undue prejudice." *N.J.R.E.* 403(a). Evidence regarding the amount of time it takes to drive from Ramsey to Sibley, Louisiana was highly relevant because it tended to prove that defendant could have murdered Paul in Ramsey on the evening of August 23, 2006, and still be in Sibley, Louisiana on the evening of August 24, 2006. Therefore, the reenactment drive done by Detective Christiana is relevant.

We also conclude that the prejudice to defendant in not being advised of Detective Christiana's drive to Louisiana until sixteen days after it was conducted—approximately two weeks before opening statements were made at trial—does not outweigh the probative value of the evidence. Defense counsel's ability to effectively cross-examine Detective Christiana regarding the physical differences between he and defendant, the three-year gap between the time when defendant drove from Ramsey to Sibley, Louisiana and the time when Detective Christiana did, and other circumstances that would suggest that Detective Christiana's experiment was not reliable, dispelled any prejudice caused by the State's delay in advising the defense of this evidence. Furthermore, nothing precluded the defense from conducting its own experiment either before the State notified defendant of its results or after receiving notification of the Detective's drive to Louisiana.

## E

Because we find no merit in defendant's other arguments, we reject defendant's contention that the cumulative effect of these alleged errors warrants a reversal of his conviction.

Affirmed.