NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1860-13T4

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

CHRISTOPHER MAZZARISI,

    Defendant-Respondent.

> **APPROVED FOR PUBLICATION**
>
> **April 28, 2015**
>
> **APPELLATE DIVISION**

_____

Argued October 15, 2014 — Decided April 28, 2015

Before Judges Lihotz, Espinosa and Rothstadt.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 12-04-0765.

Paul H. Heinzel, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for appellant (Christopher J. Gramiccioni, Acting Monmouth County Prosecutor, attorney; Mr. Heinzel, of counsel and on the briefs).

David W. Fassett argued the cause for respondent (Arseneault & Fassett, LLP, and Weir & Plaza, LLC, attorneys; Mr. Fassett and Edward J. Plaza, on the brief).

The opinion of the court was delivered by

ESPINOSA, J.A.D.

The facts and issues in this case call upon us to examine the application of the Supreme Court's decisions in State v. Sugar

(Sugar I), 84 N.J. 1 (1980), and State v. Sugar (Sugar II), 100 N.J. 214 (1985).  As in Sugar, the police surreptitiously recorded conversations between a defendant and his attorney.  There are, however, significant factual differences in the two cases.  In Sugar, police eavesdropped upon the conversations and used the information obtained to secure search warrants that resulted in the seizure of incriminating evidence and the filing of charges against the defendant.  Sugar I, supra, 84 N.J. at 5-8.  In this case, the tape recording occurred after charges had been filed when defendant appeared with his attorney to surrender.  This was the day after a witness reported defendant had fired a gun at her, a search warrant was issued, and officers executing the warrant at defendant's residence observed a bullet hole in the wall and seized a gun and shell casing.  An additional fact that distinguishes this case from Sugar is that the State maintains that no officer listened to the confidential conversation as it was being recorded.

Defendant successfully moved to suppress the testimony of three witnesses and dismiss the indictment against him, albeit without prejudice.  After we denied the State's motion for leave to appeal, the Supreme Court granted the State's motion, summarily remanding the matter to this court for consideration on the merits.

2

For the following reasons, we affirm the suppression of the three witnesses' testimony and reverse the dismissal of the indictment.

I

We begin with a review of the facts and reasoning of Sugar I and Sugar II, which concerned the prosecution of Harry D. Sugar for the murder of his wife. The issue concerning the "flagrantly illegal conduct" of the law enforcement officers, Sugar I, supra, 84 N.J. at 5, arose before Sugar was indicted. Not only did law enforcement officers intentionally eavesdrop on conversations between Sugar and his attorneys, they used the information obtained as the basis for search warrant affidavits. Id. at 7. Sugar's right to a fair trial was further threatened by the dissemination of his privileged statements to the public. Id. at 9.

Sugar was arrested on a material witness warrant shortly after midnight on August 7, 1979. Id. at 5. He had two meetings with counsel that morning. The first was with a law firm associate at approximately 2:40 a.m., and the second was with his attorney, Jay H. Greenblatt, later that morning. Id. at 5-6. Each of the meetings occurred in an interrogation room with a concealed microphone. Ibid.

When Sugar's meeting with the law firm associate commenced, Lieutenant Michael Joseph Tirelli of the Vineland Police Department went into his office with Joseph Leon Soracco, Chief

3

of Detectives, of the Cumberland County Prosecutor's Office. Id. at 6. Tirelli activated a monitor in his office that permitted them to listen to the conversation between Sugar and his attorney, telling Soracco, "it would be a good idea to know if we had a [sic] right guy or not." Ibid. He also recorded part of the conversation. Ibid.

At the second meeting, Sugar met with both Greenblatt and his associate in the same interrogation room. Ibid. Once again, Tirelli activated the monitor in his office and recorded the conversation. In addition to Tirelli and Soracco, Lieutenant Guy Buscemi and Detective John Mazzeo[1] eavesdropped upon the conversation. Id. at 6-7. Tirelli instructed Mazzeo to take notes and prepare criminal complaints against Sugar. Id. at 7. Tirelli summarized the eavesdropped conversations for Detective William L. Walters, who was drafting affidavits for a search warrant for Sugar's home. Id. at 6-7.

Tirelli led the officers in the search of Sugar's home, later boasting to Greenblatt they "had demonstrated an uncanny ability to locate what they were seeking quickly." Id. at 7. Although the fact of the illegal eavesdropping had been disclosed to the Cumberland County Prosecutor, no one advised Greenblatt that

---

[1]  Other than Soracco, all officers are members of the Vineland Police Department.

4

police officers had eavesdropped and recorded his conversation with his client. Id. at 7-8. As additional search warrants were obtained and executed, Greenblatt began to suspect the police had eavesdropped upon his interview with his client, a suspicion confirmed by an anonymous caller. Id. at 8. Greenblatt contacted the Division of Criminal Justice in the Attorney General's Office and, after the eavesdropping was confirmed, the criminal prosecution was assumed by the State. Ibid.

The harm caused was not limited to the police officers' intrusion into the attorney-client relationship. Accounts of the eavesdropping made their way into two newspapers and "detailed descriptions of [Sugar's] conversations circulated" in Vineland. Id. at 9.

Sugar's constitutional claims were based upon the guarantees provided by the Sixth Amendment of the United States Constitution and article I, paragraph 10 of the New Jersey Constitution, which "establish a defendant's right to the assistance of counsel in criminal prosecutions." Sugar I, supra, 84 N.J. at 15-16. The Court stated there were two possible ways in which the illegal eavesdropping[2] could "irreparably compromise[]" the ability of Sugar's attorney to be effective:

---

[2] The Court commented on the potential illegality of the officers' conduct, noting "the willful interception of oral communications

5

> The first is that official knowledge of the
> contents of the overheard conversation would
> prevent defendant's counsel from constructing
> and presenting an adequate defense. The
> second potential source of impairment arises
> from public knowledge of the interview between
> defendant and his attorneys.
>
> [Id. at 17.]

The Court focused on the first of these potential sources of impairment. Id. at 18.

In Weatherford v. Bursey, 429 U.S. 545, 552-54, 97 S. Ct. 837, 842-43, 51 L. Ed. 2d 30, 38-39 (1977), the United States Supreme Court declined to adopt a per se rule that every intrusion into attorney-client consultations constituted a violation of the Sixth Amendment warranting reversal of a conviction. Our Supreme Court agreed, stating: "Not every intrusion into the attorney-client relationship results in a denial of the right to effective assistance of counsel." Sugar I, supra, 84 N.J. at 18. The Court adopted the principle that dismissal of a prosecution based upon the denial of effective assistance of counsel "is the appropriate remedy for official intrusion upon attorney-client relationships only where it destroys that relationship or reveals defendant's trial strategy." Id. at 21. The Court concluded neither occurred in Sugar I. Id. at 21-22.

---

by electronic means, if not specifically permitted," is a crime under both State and federal law. Id. at 13-14 (citing 18 U.S.C.A. § 2511(1)(a); N.J.S.A. 2A:156A-3(a)).

Nonetheless, the Court stated the role of law enforcement officers in the intrusion raised the question of whether a dismissal might be required as a matter of fundamental fairness even in the absence of a Sixth Amendment violation. Id. at 14-15. Under such circumstances, the prosecution might proceed if "carefully purged of all taint from investigatory excess." Id. at 15. To be effective, the exclusionary remedy had to "vindicate[] defendant's constitutional rights and deter[] future incidents of such egregious conduct." Id. at 25.

Noting the role of law enforcement officers in the egregious conduct, the Court dictated the following remedy:

> We find that under the circumstances of this case, the only appropriate remedy is exclusion of tainted witnesses and evidence from the grand jury and at trial. Because the violation of the right to the effective assistance of counsel was so serious, and because the guarantee of a fair trial has been so threatened by the insolence of local law enforcement officers, the fruits of their lawlessness must not be allowed to aid a prosecution in any manner. . . . To permit the State to proceed before the grand jury with illegally obtained evidence would expose defendant to the threat of a tainted and compromised prosecution. It would fail to deter those who would seek the publicity of an indictment even if a subsequent trial would fail for lack of untainted evidence. . . . [The grand jury] may not receive evidence obtained in blatant violation of the federal and State constitutions, [U.S. Const., amends. IV, VI; N.J. Const. art. I, ¶¶. 7, 10], and State law proscribing illegal electronic surveillance, N.J.S.A. 2A:156A-3, -21.

7

> Accordingly, we hold that a threshold hearing to determine the extent of taint should take place before the grand jury begins to receive evidence.
>
> [Id. at 25-26 (emphasis added) (internal citations omitted).]

At the hearing that followed Sugar I, the trial court determined the only witness who had to be excluded in the grand jury proceedings and at trial was Tirelli. Sugar II, supra, 100 N.J. at 225-26. The Court reviewed that decision in Sugar II.[3]

The Court observed that because its earlier decision addressed taint arising from two different sources — either exposure to the publicity about the eavesdropped conversations or participating in the eavesdropping - there was a need to clarify the scope of disqualification for witnesses tainted by the illegal conduct. Id. at 226-27. The Court described "the purport" of its prior decision:

> [A] witness with direct first-hand knowledge of the contents of the unlawful intercept, particularly a witness who had engaged in or attended the intercept itself, [cannot] thereafter testify in the prosecution of defendant. . . . We confirm and reiterate that ruling: as a matter of law, a person who actually participated in, attended, or was contemporaneously informed of the unlawful intercept must be deemed to have been tainted by his direct knowledge of the intercept; he is therefore disqualified to testify as a witness in defendant's prosecution.

---

[3] Sugar did not challenge the participation of Soracco, Buscemi, or Walters as witnesses.

8

[Ibid. (emphasis added).]

The point that required clarification concerned comments the Court made in Sugar I addressing the potential prejudice arising from publicity about the intercepted conversations. Id. at 227. In Sugar I, the Court stated that witnesses should be permitted to testify who "can lay aside [their] impression or opinion, and render testimony free from the influence of the illegally grounded publicity." Sugar I, supra, 84 N.J. at 24-25 (citation and internal quotation marks omitted). In Sugar II, the Court clarified this statement:

> This direction . . . was not intended to apply to witnesses, such as Mazzeo or Tirelli, who were actually responsible for the illegal wiretap. Our direction concerning witnesses who could overcome any potential taint was included in that portion of the Court's opinion dealing with prejudicial publicity. This focused on whether information relating to the illegal intercept had reached members of the public, including potential witnesses, thereby imperiling a fair trial . . . .
>
> In this context, we were not referring to persons who had actually participated in, attended, or contemporaneously received information of the illegal intercept. Witnesses so directly involved in the illegal intercept itself were tainted in a direct and primary sense. We have no hesitancy in directing that they be excluded from any attempt to prosecute the defendant.
>
> [Sugar II, supra, 100 N.J. at 227 (emphasis added).]

9

The Court described the remedy it prescribed as "the exclusion of primarily tainted witnesses from the prosecution" and stated it was "minimally required in view of the profoundly offensive nature of the official misconduct in [that] case." Id. at 228.

II

The events relevant to this appeal all occurred on two days. On November 9, 2011, defendant's nineteen-year-old girlfriend, K.S., went to the Holmdel Township Police Department to report an assault. We draw upon the statement she gave to police to summarize the salient facts regarding the alleged offense.

That morning, K.S. received a text message from a friend, which defendant misinterpreted. What began as a verbal fight escalated. When K.S. packed her things to go, defendant pulled out his gun. He was screaming, waving the gun around, and saying he was going to shoot. K.S. heard a "pop" and ducked. Defendant thwarted her efforts to call the police. K.S. stated she screamed, kicked, and tried breaking windows to escape while defendant kept the gun in his hand. K.S. attempted unsuccessfully to escape by kicking the front window in the empty guest room. K.S. stated defendant grabbed her neck and hood each time she kicked at the window. After she was able to leave through the garage door, defendant came outside, unarmed, and threw her keys to her. K.S. drove directly to the police station, where red marks were observed

10

on her neck, arms, and on the inside of her wrist. K.S. reported she believed defendant had a rifle and shotgun.

That day, a municipal court judge granted K.S. a temporary restraining order against defendant and issued a search warrant authorizing the police to enter defendant's home to search for and seize his firearms and firearms purchase or identification card. Defendant's father, who resided with defendant, also gave his consent to a search of the residence.

Detective Eric Hernando conducted the search of defendant's home with Sergeant Jeffrey Ackerson, Detective Andrew Kret, and three others: Lieutenant Michael Smith of the Holmdel Police Department and Detectives Peter Gosza and Jose Cruz of the Monmouth County Prosecutor's Office. They recovered a spent .22 caliber shell casing from the floor of the bedroom where K.S. said the shooting occurred. There was a small hole consistent with the size of a projectile fired from a rifle in the center of the wall inside an open closet. The officers also seized a rifle matching a description given by K.S. In addition, the detectives observed extensive damage inside the spare bedroom that included damage to the window screen consistent with an effort to kick out the window.

A complaint was filed charging defendant with attempted murder, aggravated assault, criminal restraint, criminal mischief, and weapons offenses. The police were notified that defendant

11

would come to the police station with his attorney to surrender before 2:00 p.m. the next day.

Defendant arrived with his attorney, Edward J. Plaza, the next day as promised. When Hernando learned they were in the lobby, he turned on an audio and video recording system called Case Cracker that was linked to the interview room. He entered defendant's name and the case number into the monitor to label the recording and then ushered Plaza and defendant into the interview room. He positioned defendant and Plaza in the interview room so they would be facing the covert camera located in the room and then left them alone in the room.

Hernando testified he knew the recording device was operating when he left defendant and counsel alone in the room. He did not advise Plaza or defendant they were being recorded because, he said, he was not required to do so. Hernando further stated it was the department's standard operating procedure to video and audio record an attorney and client when the client surrenders.

While Hernando was out of the room, Plaza instructed defendant not to volunteer certain information about his appearance. The instructions may be interpreted as relating to defendant's activities after the alleged assault.

After approximately one and one-half minutes, Hernando returned to the interview room with Ackerson and Kret. A report

12

of the internal affairs investigation that followed includes admissions by both Ackerson and Kret that they knew the audio and video recording device was operating at this time.

Defendant was advised he was under arrest and served with the complaints and warrants against him. Plaza informed the officers defendant would not be answering any questions. Hernando testified this was the first time he learned defendant was not going to make a statement.

Hernando served defendant with the temporary restraining order. Within ten minutes of their entry into the interview room, Hernando, Ackerson, and Kret left. Hernando told defendant and counsel he would return in a few minutes and left the interview room to contact an assistant prosecutor regarding bail. Once again, he did not caution defendant or his counsel they were being recorded. However, he testified that, unlike the first occasion, he forgot the recorder was on when he left the room.

Other than returning briefly to provide defendant with his sweatshirt, Hernando left defendant and Plaza alone in the room for ten minutes. During that time, there was discussion between them that may be characterized as relating to possible drug use by defendant. Defendant asked Plaza whether there was a concealed camera in the room. Plaza replied, "Could be."

13

Hernando came back and provided the bail information to defendant and his counsel. Plaza left to speak to the assistant prosecutor and returned to briefly discuss the bail with defendant. In the course of that private conversation, Plaza made a statement to defendant to the effect that he was "a decent kid" who made a mistake, "who lost his head[,] whose got problems."

Plaza left the police station at approximately 2:15 p.m. Hernando turned off the recording device at 2:17:39 p.m. Asked whether he "unforgot" he had not shut off the recorder, Hernando replied taking Plaza back to the lobby "must have made [him] remember that [he] need[ed] to shut it off." He also admitted the purpose of the recorder was to record defendant and his attorney.

Hernando was the lead detective on the case. It was his decision to turn on the recording equipment in the interview room. On cross-examination, Hernando said he believed there was a possibility defendant would agree to be interrogated and make a statement when he surrendered. However, he admitted that, in his nine years' experience as a detective, no attorney has ever permitted him to interrogate a client who surrendered.

Hernando testified a remote speaker can be connected to a desktop computer in the detective bureau to listen to what is being recorded in the interview room. He also said it was possible to visually monitor the interview room on a computer screen in the

14

detective bureau.  He stated the speaker in the detective bureau was turned off on the day of defendant's surrender.

Hernando was the only witness produced by the State at the suppression hearing.  Without providing any foundation for his personal knowledge as to the actions or intent of Ackerson and Kret, Hernando testified none of them "purposely [left] the video recording system on" and none of them "listen[ed] in on any of the conversations" between defendant and Plaza.  Hernando stated he did not review the recording contemporaneously "because there was nothing on it that [he] needed to review."  Hernando testified he watched and listened to the DVD one time, approximately one month before the suppression hearing, when he was asked to confirm the accuracy of the transcript that had been prepared.

It is conceded the recording of the conversations between defendant and his counsel violated the Monmouth County Uniform Policy for Videotaped Review of Formal Written Statements (the Policy).  The Policy[4] states explicitly,

> [I]f the target meets with and speaks to his attorney privately, the tape must be turned off to avoid breaching the attorney/client privilege.

---

[4]   A copy of the Policy has not been included in the record.  We rely upon quotations from the Policy included in testimony and the trial court's opinion.

15

The Policy states further, "videotaping procedures are to be employed only to memorialize the reviewing and signing of a formal written statement by an adult or juvenile targeted in an investigation regarding a first or second degree crime." Hernando acknowledged he was not videotaping a formal written statement.

Hernando testified he first became aware that the video recording device had not turned off and continued to record defendant with his attorney when his supervising lieutenant told him the internal affairs division of the Prosecutor's Office was looking into the matter. This testimony was inconsistent with his earlier testimony that: (1) he knew the recorder was on when he first left defendant and his counsel alone in the interview room and (2) he remembered the recorder was on when Plaza left the building and turned it off at that point.

Hernando also testified as to the results of the internal affairs investigation.[5] No criminal charges were filed against him. He was not punished or penalized in any way. The police department's only response to his failure to turn the video recording device off was to require him "to review the policy regarding the recording of interviews."

---

[5] The report of the investigation was marked for identification. The defense moved for the admission of all exhibits marked; the State did not object to the admission of this report and the motion judge listed it among the exhibits in evidence.

16

The State presented this matter to the grand jury on April 10, 2012. Hernando was the sole witness. In his testimony, he described his actions and observations on November 9, 2011. He also reviewed the statement provided by K.S. on November 9, 2011, information received from a former girlfriend of defendant's regarding a possible motive to fabricate by K.S., and a second statement obtained from K.S. thereafter. Although Hernando testified defendant turned himself in, he provided no information derived from the recorded communications between defendant and his counsel. Further, the record does not reveal any investigative action taken after defendant's surrender that was prompted by any recorded communications.

## III

The State conceded the taping of defendant's conversation with his attorney violated the Policy but contended the taping of the conversation was unintentional. Although the motion judge stated he could not find the taping was "intentional" as a matter of law, he noted it was "clear" the conversation should not have been recorded, citing the Sixth Amendment to the United States Constitution, the New Jersey Constitution art. 1, ¶ 10, and N.J.R.E. 504, and proceeded to review the evidence in light of the considerations identified in Sugar I and Sugar II.

A-1860-13T4

The court reviewed the three instances we have described: the discussions of defendant's actions after K.S. left, defendant's possible drug use, and Plaza's opinion he was a decent kid who made a mistake. The court observed the violation of the Policy had not resulted in a breakdown of the attorney-client relationship in light of Plaza's continued representation of defendant. Next, the court considered whether trial strategy had been revealed to the detriment of defendant. Although describing the comments as touching upon "guilt and innocence and things of that nature," the court concluded the comments did not disclose trial strategy. The motion judge found Ackerson and Kret were clearly aware of the Policy; knew the tape was on while they were in the room; knew the recorder needed to be shut off when an attorney and client were speaking alone and assumed the recorder was turned off when defendant was left alone with his attorney.

The judge concluded the violation here was a "constitutional injury." He ordered that Hernando, Kret, and Ackerson be barred from participating in the prosecution and, because the State's case was presented to the grand jury through Hernando's testimony, he dismissed the indictment without prejudice.

In its appeal, the State argues the motion judge erred in barring the testimony of the three witnesses because the recording of defendant's conversation with his counsel was unintentional,

18

not prejudicial, and did not violate the Sixth Amendment. The State further argues the disqualification of Kret and Ackerson was arbitrary and that there was no basis to dismiss the indictment.

IV

We first consider whether the police misconduct here resulted in a constitutional violation. "Because intrusions into the attorney-client relationship are not per se unconstitutional, establishing a Sixth Amendment violation requires some showing of prejudice in terms of injury to the defendant or benefit to the State." United States v. Noriega, 764 F. Supp. 1480, 1488 (S.D. Fla. 1991).

> [C]ourts have identified the following factors to consider in determining whether the requisite amount of prejudice needed to establish a Sixth Amendment violation is present: (1) whether the government's intrusion was intentional; (2) whether the prosecution obtained confidential information pertaining to trial preparations and defense strategy as a result of the intrusion; and (3) whether the information obtained produced, directly or indirectly, any evidence used at trial, or was used in some other way to the defendant's substantial detriment.
>
> [Id. at 1489.]

See also Sugar I, supra, 84 N.J. at 18-19; State v. Ates, 426 N.J. Super. 614, 628 (Law Div. 2009), aff'd, 426 N.J. Super. 521 (App. Div. 2012), aff'd, 217 N.J. 253 (2014), cert. denied, ____ U.S.

____, 135 S. Ct. 377, 190 L. Ed. 2d 254 (2014); State v. Santiago, 267 N.J. Super. 432, 436-37 (Law Div. 1993).

In Sugar I, decided more than a decade earlier, our Supreme Court's analysis of the Sixth Amendment issue included consideration of similar factors. There was no question in Sugar I regarding the intentional nature of the law enforcement officers' egregious conduct. The second and third Noriega factors, which relate to whether information was revealed that would impact the defense and whether that information could be used to a defendant's detriment, Noriega, supra, 764 F. Supp. at 1489, are mirrored in the Court's statement that dismissal of a prosecution based upon the denial of effective assistance of counsel "is the appropriate remedy for official intrusion upon attorney-client relationships only where it destroys that relationship or reveals defendant's trial strategy." See Sugar I, supra, 84 N.J. at 21.

A

The question whether the State's conduct here was intentional requires a fact-sensitive analysis. At the outset, we note this was not a case where the interception was the result of errors committed by a third party, e.g., In re Pharmatrak, Inc. Privacy Litig., 292 F. Supp. 2d 263, 267-68 (D. Mass. 2003), or due to a design defect in equipment after the recording was believed to be

20

terminated.  E.g., Sanders v. Robert Bosch Corp., 38 F.3d 736, 742-43 (4th Cir. 1994).

In Santiago, supra, the recording of a conversation between attorney and client by the courtroom's sound system was found "clearly unintentional."  267 N.J. Super. at 437.  Similarly, the recording of conversations between a defendant and his attorney that occurred as a result of the routine recording of prisoners' telephone calls by the Bureau of Prisons was also deemed to be unintentional in Noriega, supra, 764 F. Supp. at 1489.  In neither Santiago, supra, 267 N.J. Super. at 437, nor Noriega, supra, 764 F. Supp. at 1489, was the actual recording the product of prosecutorial action and, in Noriega, the defendant had no reasonable expectation of privacy in engaging in the telephone calls under the procedure he used.  Id. at 1488.

The recording in Ates, supra, 426 N.J. Super. at 623-24, was, however, the product of prosecutorial action.  Although the intercept was conducted pursuant to a court order authorizing the electronic interception of the defendant's telephone communications, it violated the clear restriction in the order that "no attorney client conversations may be intercepted."  Id. at 625 (internal quotation marks omitted).  The trial court found the interception and recording of a call to the defendant from his attorney's office violated the wiretap order, the Prosecutor's

21

protocol on minimization procedures, the New Jersey Wiretapping and Electronic Surveillance Control Act, N.J.S.A. 2A:156A-1 to -37, and case law. Id. at 626-27.

Still, the court concluded the interception was inadvertent. Id. at 628. The court accepted the version of events provided by the monitoring officer, whom he found "forthright and candid" in admitting and explaining how he failed to notice the incoming call and allowed it to be recorded by leaving earphones in the monitoring device while working on the log sheet. Id. at 624, 628-29. The court further noted the officer accepted responsibility for his error and promptly brought the violation to the attention of his superior officer when he discovered it at the end of his shift. Id. at 629. The court also considered this call within the context of the significant number of calls between the defendant and his attorney's office, which were "promptly minimized and not recorded." Ibid. The court concluded, "rather than establishing a pattern of unauthorized and unlawful interception of privileged communications . . . the interception and recording of [the privileged call was] . . . an isolated and aberrant event." Ibid.

The conceded facts here distinguish this case from Ates, Santiago, and Noriega. Hernando made a conscious decision to turn on the taping device to record statements made in the interview

22

room when defendant and his attorney were present without providing any notice to them that they were being recorded. After Plaza stated his client would make no statements, Hernando left defendant and counsel alone in the room where their conversation would be recorded. Hernando is a law enforcement officer bound to comply with the Policy he admittedly violated. Further, in light of Hernando's testimony he was following standard procedure, a view echoed by both Ackerson and Kret, this was not "an isolated and aberrant event" as in Ates. We therefore conclude the recording of communications between defendant and his attorney was intentional. See, e.g., Commonwealth v. Fontaine, 524 N.E.2d 75, 76-78 (Mass. 1988) (finding the recording intentional where a defense attorney met with his client in a prison cell and the booking officer, who knew the area was being recorded, failed to turn off recording device or advise defendant and his attorney they were being recorded).

B

Our next inquiry is whether the information recorded included confidential information, Noriega, supra, 764 F. Supp. at 1489, or revealed defense strategy, Sugar I, supra, 84 N.J. at 21.[6] Although there were two statements in Sugar I that "reflect[ed]

_____

[6] Like Sugar, defendant does not argue that the intrusion destroyed his relationship with his attorney. Sugar I, supra, 84 N.J. at 21.

23

an awareness of possible defenses," the Court concluded that no trial strategy had been revealed because neither statement "amount[ed] to a strategic decision and thus cannot be used by the State to [the] defendant's detriment." Sugar I, supra, 84 N.J. at 22 (emphasis added).

In this case, Plaza was prudent and measured in his discussion with defendant, even advising defendant of the possibility the interview room could be under surveillance. The record does not reflect that "official knowledge of the contents of the overheard conversation would prevent defendant's counsel from constructing and presenting an adequate defense." See id. at 17. Although there were statements reflecting an awareness of facts that could be relevant to the case, none of the statements by Plaza or defendant amounted to "a strategic decision." See id. at 22. We therefore conclude the information recorded did not reveal any trial strategy.

C

The final Noriega factor addresses "whether the information obtained produced, directly or indirectly, any evidence [to be] used at trial or . . . used in some other way to the defendant's substantial detriment." Noriega, supra, 764 F. Supp. at 1489. The search warrants were obtained and executed and the charges brought all before the recorded communications. Nothing from the

24

improperly recorded conversation was presented to the grand jury. In short, the State's case and proofs were set before the improper recording. We are confident a remedy may be fashioned here that will adequately safeguard the rights of defendant at trial.

Thus, although we find the recording here to be an intentional act by law enforcement, no confidential defense strategy was revealed and defendant need not suffer any prejudice from the recording at trial. Therefore, the intrusion here did not rise to the level of a Sixth Amendment violation.

Even in the absence of a constitutional violation, a dismissal of charges may be appropriate when "conduct by law enforcement officials . . . perverts the judicial process and turns it into a prosecutorial tool." Sugar I, supra, 84 N.J. at 14. That is not the case here, where neither the search warrants nor the indictment were based upon any information revealed in the recorded conversation. Finding no Sixth Amendment violation or any corruption of the judicial process, we conclude dismissal of the charges is not warranted.

V

We turn to the appropriate remedy under these circumstances. Given the egregious conduct in Sugar I, the Court found "the only appropriate remedy" was "exclusion of tainted witnesses and evidence from the grand jury and at trial." Id. at 25.

25

The State must "be 'in no better position than it would have enjoyed had no illegality occurred.'" State v. Smith, 212 N.J. 365, 395 (2012) (quoting Sugar II, supra, 100 N.J. at 239-40), cert. denied, ___ U.S. ___, 133 S. Ct. 1504, 185 L. Ed. 2d 558 (2013). However, even when there is a Sixth Amendment violation, "the general rule [applies] that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." United States v. Morrison, 449 U.S. 361, 364, 101 S. Ct. 665, 668, 66 L. Ed. 2d 564, 568 (1981); cf. Smith, supra, 212 N.J. at 393-401 (applying the independent source rule to affirm denial of motion to suppress evidence obtained as the result of a warrant flawed because the supporting affidavit's omissions rendered it inaccurate).

The role of the exclusionary remedy employed by the Supreme Court in Sugar I is twofold: to vindicate defendant's constitutional rights and to deter police from such conduct in the future. Sugar I, supra, 84 N.J. at 25. For the prosecution to proceed, it must be "carefully purged of all taint from investigatory excess." Id. at 15.

The State would have us rule that no remedy is required here because there were no disclosures of trial strategy or other information prejudicial to defendant. If we were to adopt this argument, the exclusionary remedy would only apply to cases in

26

which there was an actual violation of a defendant's Sixth Amendment right to effective assistance of counsel. The remedy prescribed by Sugar I and Sugar II is not so limited. It is applicable as well to cases in which there has been no constitutional violation, but fundamental fairness requires a remedy. Sugar I, supra, 84 N.J. at 15. To read the Sugar cases otherwise would limit the objective of the exclusionary remedy to vindicating the violation of a defendant's rights and ignore its purpose to deter future incidents of police misconduct. See id. at 25. We decline to do so.

### A

We first consider what is required to purge the factual evidence of taint. Obviously, Plaza's opinion that defendant was a good kid who made a mistake could not be used by the State in any way, even if there had been no impropriety. At a minimum, a careful purge requires that the references to defendant's actions after K.S. left his residence and possible drug use be suppressed as information obtained from the improper recording.

### B

The scope of that purge also includes all "primarily tainted witnesses." Sugar II, supra, 100 N.J. at 228. Such witnesses include persons "actually responsible for the illegal wiretap," id. at 227, and those "with direct first-hand knowledge of the

27

contents of the unlawful intercept, particularly a witness who had engaged in or attended the intercept itself." Id. at 226.

It is clear Hernando is "tainted in a direct and primary sense" as defined in Sugar II. See id. at 227. It was his decision to activate the monitoring and recording device in the illusory hope that defendant might be the first suspect in his nine years' experience to make a statement when he surrendered with counsel. Hernando admitted he intentionally turned on the recording device for the purpose of recording communications in the interview room and knowingly left defendant and his counsel alone in the room with the recorder operating. It was, therefore, his conscious objective to record communications in the interview room surreptitiously, an objective he did not abandon when attorney and client were left alone in the room. He was, therefore, admittedly a person who was "directly involved in the illegal intercept itself," having "actually participated in [and] attended . . . the illegal intercept." See ibid. Moreover, although he states he only reviewed the contents of the recording once, when instructed to proofread the transcript of the recording, Hernando remains a witness with "first-hand knowledge of the contents of the unlawful intercept." See id. at 226.

28

C

It was the State's burden to "establish beyond a reasonable doubt that it [could] conduct a prosecution with unsullied evidence and witnesses." Sugar I, supra, 84 N.J. at 25. However, although the record indicates Ackerson and Kret were both available at the time of the hearing to be called by either the State or defendant, neither testified at the hearing.

Hernando's testimony as to their knowledge and intent did not constitute competent evidence. N.J.R.E. 602; Neno v. Clinton, 167 N.J. 573, 585 (2001) ("'A person who has no knowledge of a fact except what another has told him [or her] does not, of course, satisfy the present requirement of knowledge from observation.'") (alteration in original) (quoting McCormick on Evidence § 10 (Strong ed., 5th ed. 1999))).

The only evidence as to Ackerson's and Kret's knowledge came in the form of the report of the internal affairs investigation. According to the report, each of them stated he was aware the recording device was on when they were in the room with defendant and Plaza and assumed it was turned off when they left the room after counsel stated his client would not make a statement.

Pursuant to N.J.R.E. 803(b)(2), Ackerson's and Kret's statements they knew the recording device was on are admissible as admissions. However, their exculpatory assertions that they

29

assumed the recording device was turned off when they left the room constitute hearsay not admissible under any exception. See State v. DeRoxtro, 327 N.J. Super. 212, 223-24 (App. Div. 2000) (rejecting the argument that a self-serving "exculpatory portion of a [hearsay] statement should [necessarily] be permitted to 'tag along' with the inculpatory part, under the doctrine of continuing trustworthiness or for reasons of completeness"); State v. Gomez, 246 N.J. Super. 209, 215-16 (App. Div. 1991).

The practice of surreptitiously recording meetings between police officers and a defendant who appears with counsel may be ill-advised, but it is not illegal. See N.J.S.A. 2A:156A-4(b) ("It shall not be unlawful under this act for . . . [a]ny investigative or law enforcement officer to intercept a[n] . . . oral communication, where such officer is a party to the communication . . . ."); 18 U.S.C.A. § 2511(2)(c) ("It shall not be unlawful . . . for a person acting under color of law to intercept a[n] . . . oral . . . communication, where such person is a party to the communication . . . ."); 18 U.S.C.A. § 2511(2)(d) ("It shall not be unlawful . . . for a person not acting under color of law to intercept a[n] . . . oral . . . communication where such person is a party to the communication . . . ."). The critical question as to whether Ackerson and Kret were tainted by the improper recording here cannot be resolved without competent

30

evidence regarding their knowledge and actions after they left the interrogation room, which would be subject to cross-examination. Having failed to present such competent evidence, the State has not carried its burden of establishing beyond a reasonable doubt that these witnesses were free from taint.

D

Finally, we consider whether the appropriate remedy here requires the dismissal of the indictment without prejudice. In establishing the parameters for a fair presentation to the grand jury, the Supreme Court stated the State must be prohibited from "proceed[ing] before the grand jury with illegally obtained evidence," including "evidence obtained in blatant violation of the federal and State constitutions, and State law proscribing illegal electronic surveillance." Sugar I supra, 84 N.J. at 25-26 (internal citations omitted).

As we have stated, although Hernando was the messenger, none of the evidence delivered to the grand jury was illegally obtained or tainted by the improper recording here. Moreover, the trial court did not reject his testimony that he first became aware of the contents of the intercepted conversation when he proofread the transcript, well after he testified before the grand jury. To require the State to present the evidence to the grand jury again through a different witness would merely result in some

31

inconvenience to the State without any appreciable benefit to defendant. We are satisfied the suppression of evidence and witnesses we require provides a remedy that is "tailored to the injury suffered" without "unnecessarily infring[ing] on competing interests," Morrison, supra, 449 U.S. at 364, 101 S. Ct. at 668, 66 L. Ed. 2d at 568, and places the State "in no better position than it would have enjoyed had no illegality occurred." Smith, supra, 212 N.J. at 395 (quoting Sugar II, supra, 100 N.J. at 239-40). We therefore reverse the order dismissing the indictment without prejudice.

In sum, we conclude Hernando, Ackerson and Kret must be excluded from participating in the prosecution of defendant and that the State is prohibited from using any information provided in the recorded conversation at trial. We also conclude the grand jury presentation was untainted by the improper recording of an attorney-client communication and reverse the order dismissing the indictment without prejudice.

Affirmed in part and reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

32